Case number 24-5945, Robert Watt et al. v. FedEx Corporation et al. Argument is not to exceed 15 minutes per side. Mr. Bograd, you may proceed for the accountants. May it please the court, Louis Bograd for appellants Robert Watt et al. And I've requested to reserve three minutes for rebuttal. I'm sensitive, Judge Stranch, to the comment you made at the beginning. I don't want to be redundant of the last argument since the same legal issues are raised. So let me begin by saying I adopt and incorporate by reference everything my colleague, Ms. Pava, just said. It is consistent with the positions we are taking here. And this is a little weird since I'm the appellant going first, but I already know something about where all of you are. So I wanted to start by responding to some of the concerns that you, Judge Bush, and you, Judge Naboundian, raised during the argument. Judge Bush, you started by asking about what actuarial equivalent meant in 1974. If you look in our brief, and I believe this is, I'm now confused about whether this is my, this must be our reply brief. At page seven, we cite to a Washington Supreme Court decision from 1959, so 15 years before ERISA, in which the Washington Supreme Court said that an actuary, quote, actuarial equivalent, unquote, calculation, quote, reasonably requires the most accurate tables available. Okay, so that's very helpful for your point. Yes, that's 1959, en banc, Washington Supreme Court. We also Do you agree that you're really importing the word reasonable, that you have to, that actuarial equivalence has to imply that the assumptions are reasonable? Yeah, I mean, we could say reason, we could say contemporary, we could say, you could come up with a lot of words. But yes, we are saying that the kind, that equivalent has to mean something, has to mean something related to, I mean, we can't, you know, we don't know how long the employee and the employee's spouse are going to live. Right. So we have to be talking about an equivalent estimate about how much is going to be paid out over a stream of time. And yes, I think that inherently, we're talking about reasonable, I think. Again, my concern is we don't really have any evidence of what the industry understood actuarial equivalence to mean as of 1974. Well, that's what I'm But you've got this one case. I've also got, we also cite on the next page, page eight of our reply brief, a Hamilton and Bronson pension book from 1958, which says that actuaries must utilize a realistic, as realistic a basis of mortality at all ages as is possible, and to bear in mind that allowance must be made for possible mortality improvement in the future, and select a mortality basis which will be representative of the mortality which will actually be experienced. And a third source from 1964, if the actuary performing the evaluation is competent and true to the ideals of his profession, he will base his forecasts and assumptions, which at the time of the valuation, seem to be the most appropriate for the case at hand. So those are all pre-ERISA citations to, well, one to the Washington Supreme Court case, and to actuarial publications that define what actuaries understood in 1974, and prior to 1974, the phrase actuarial equivalent meant. Now, as Ms. Poppeck just said, I don't think the parties disagree about what that actuarial equivalent's meaning has not changed over time. We disagree about whether... Whether your assumptions have to be reasonable or not. Yeah, and whether they have to be updated as circumstances change. Yeah, and reasonable, as I'm saying, is updated numbers. Yeah, and what... And what I've struggled with is actuarial equivalents just another way of saying equal to between each side, but you can have different assumptions on each side, and it seems like your folks on the other side of this case are saying that as long as we've disclosed our inputs on each side, it doesn't really matter what they are as long as they are equal to each other, and I think you're trying to say actuarial equivalents means that your inputs have to be reasonable on each side. Exactly. Yes. In addition to their being equal to each other. Right, and we resist the word reasonable only because it's not the word that comes from the statute, but I wholly agree. No, I don't know what word it is, but it has to be reasonable, it has to be accurate, it has to be something that... Yeah, and all the case law gets to the word reasonable. I guess you're resisting because you have the word reasonable in some provisions, but you don't have it here. Although I think... But you don't have actuarial equivalents in the other provisions. Exactly. I think Judge Stranch already fully answered that question, that the other provisions are not comparable because they're very different. They were also all much later enacted. Why would 1055G specify a mortality table and an interest rate? Why wouldn't it have just said actuarial equivalents? Because it would have done the same work that you're saying it did. It makes no sense to me, and in fact, wasn't Congress... 1055G, I think, is the provision where Congress amended it, right, to address a specific problem where employers were monkeying around with interest rates? Exactly. They went to Congress and said, hey, would you do something about these unreasonable assumptions? And they said yes. Yeah. Put in a mortality table and an interest rate. And they did it because so many employees would opt for lump sum payouts when they retired rather than an income stream through an annuity, and the companies were playing fast and loose with the calculations. And that's the way the legislative process is supposed to work when a statute doesn't really have what we think it should have in it. And, you know, should all these cases come out the wrong way, then we should go to Congress and say you should put specific mortality numbers into the table. But we don't need to, and we don't need to because the statute already says that the calculations must be actuarially equivalent. And I think, Judge Bush, I want to point out an important fact that we actually cited in our complaint in the case. This is in paragraphs 93 to 97. FedEx uses very different mortality assumptions when it is reporting to the SEC about the adequacy of the funding of its pension plans because they are required to comply with generally accepted accounting principles in those purposes. And they use much more contemporary data in telling the SEC whether they have adequately funded their pension plan than the assumptions they use in paying out joint survivor annuities under their pension plan. So I think that's a pretty, and that's in paragraphs 93 to 97 of our complaint, which is document 33 in the district court record. No, that's our brief is document 33 in this record. The complaint is presumably document 1 in the district court record. Your plan is a bargain for plan. Is that correct? Yes. Okay. So it seems strange to be arguing something is not actuarial equivalent if representatives of your clients have already agreed to these numbers that are in the plan through a collective bargaining arrangement. Well, Your Honor, I think they were negotiated 50 years ago or whenever this plan was first created. Aren't they negotiated every time they engage in collective bargaining? Well, I don't think that any of that is in the record, but I imagine that it is not the case that the mortality table assumptions are revisited. Well, they could be revisited, though. They could be, but just to be clear, Your Honor, this court and the Supreme Court have already answered the implicit question you're raising. In this court's opinion in West v. A.K. Steele and in the Supreme Court's decision in UMW v. Robinson, courts have consistently held that ERISA was enacted to restrict employers and employees' freedom of contract when bargaining over pensions. Employers do not have to provide pension plans, but when they do, those plans must comply with Title I of ERISA. The plan cannot contract around the statute. So if the statute requires actuarial equivalence, it is not an answer to say, well, the union said it was okay. Nor is there collective bargaining at that level of detail. I think that's correct, Your Honor. As I said, I don't want to just reiterate everything that my colleague said, so let me point to a few things that we have not really talked about yet. First, FedEx offers no alternative explanation for the meaning of actuarial equivalent. To their mind, it means nothing more than what's written down in the plan. But there are other provisions of the statute that already require the plan to state its calculations in writing to eliminate employer discretion and calculations. So it would be entirely superfluous to then include this provision solely to say, you need to put the details down in your plan. And I'd be curious to hear what the other side has to say about what they think the 1055D actually accomplishes if it doesn't accomplish what we say it accomplishes. We've talked a little about regulations. Your Honor, Judge Nabandian, you asked about the Treasury regs and their relationship to labor. After the Retirement Equity Act of 1984 amended ERISA and Treasury amended 10401A-11, the Treasury Notice of Proposed Rulemaking expressly said, these regulations also apply to employee plans subject to Title I of ERISA. So ERISA is a jointly administered statute by the Treasury and Labor Departments because it deals both with tax treatment of pensions and with payouts. Are they in violation of that reg right now? I would say they are, Your Honor. The IRS could go say, look, you lose your favorable 401 tax treatment. I think they could. I'm not a tax lawyer. So there is an external check on an employer doing something that would be completely crazy. They would be risking their tax treatment, right? They would be. I assume there's also a Department of Labor check. They could go in and – Right, but I've been hearing people say, oh, there's no – under their view, they could do whatever they want and nothing bad would ever happen to them, except maybe they might lose their favorable tax treatment, which seems like it would be pretty bad. Yeah, I don't disagree, Your Honor, but obviously we have a system of civil justice in this country where private litigants can step in when the government fails to. I'm just trying to see whether there is anybody anywhere that would have anything to say about somebody using a mortality table from 1600. I see that my time has expired. May I continue for just a minute, or would you rather I wait for rebuttal? Just a couple of additional points. This court in Heisler v. Jeep actually used the Treasury regs to interpret the meaning of eligibility for a joint and survivor annuity under ERISA. It's Heisler v. Jeep, 807 F. Second, 505 at 508. So clearly our assertion that the Treasury regs do have relevance here has been recognized by this court. Do you agree at minimum that they are persuasive evidence? They certainly are, and indeed, as we pointed out in our brief in the Drummond case in the 11th Circuit, the Labor Department filed an amicus brief endorsing the same interpretation as the Treasury regs. I'd like to conclude briefly before we go to rebuttal with the legislative purpose here. This is a statute that exists to protect employees and to protect their spouses or their widows. The whole point of the statute, and the Supreme Court said this in Boggs, is ERISA's solicitude for the economic security surrounding spouses would be undermined by allowing employers to give a married worker a lower pension than an otherwise similarly situated unmarried worker. Sorry, I thought there was another quote. As Judge Kavanaugh, then Judge Kavanaugh, now Justice Kavanaugh, said in his concurrence in Stevens, ERISA's actuarial equivalence requirement serves to protect actual retirees, not merely to ensure that pension plans perform abstract calculations. Therefore, ERISA requires actual equivalence between the actual distribution and the accrued benefit it replaces. If we are to serve ERISA's purpose of protecting the surviving spouses of deceased employees through the pension system, we need to insist that employers use actuarial equivalent calculations in paying for QJSAs. I will reserve the rest of my time for rebuttal. Good morning, Your Honors, and may it please the Court. My name is Jeremy Blumenfeld on behalf of the FedEx Appellees in this matter. Again, I'm going to try and be respectful of the questions you've already asked and try not to duplicate effort. There are a few things that I would like to emphasize, though. Maybe I'll start with the Stevens case that counsel ended with. In Stevens, Justice Kavanaugh said that they were dealing with a regulation that said that a reasonable delay in paying a lump sum, and Stevens involved a lump sum subject to special rules, would be okay and an unreasonable delay would not be okay. One of the judges on the panel said that the delay in that case was unreasonable and, therefore, the plaintiff wins. One of the judges said that the delay in that case was reasonable and, therefore, the defendant wins. The third judge, Justice Kavanaugh, said, whether it's reasonable or not doesn't matter because the statute doesn't impose a reasonable requirement. It requires actuarial equivalence and for lump sums using those specific mortality assumptions. I think we've talked about the reasons. Is that an argument for your ability to state in a plan anything you choose as a mortality? That doesn't seem to me to support that because what his point was was equivalence is equivalent. In the context of lump sums, you have to use specific factors. What the court said in that case was that equivalence was based on a given set of assumptions. I think you asked a question about a life insurance contract that somebody might have outside the ERISA context. Everybody would agree that actuarial equivalence in a life insurance contract would be determined by the terms of that contract, not what might happen to be reasonable at some later point in time. You also asked some questions, Your Honor, about and counsel raised the question about plan funding and how well-funded the plan is. But that's a specific provision in ERISA. That's in 29 U.S.C. 1083. And in that place, like in the withdrawal liability context, Congress says you need to use actuarial assumptions that are reasonable and that reflect an actuary's judgment. And the reason Congress can do that in that context is because it doesn't affect, as you pointed out, Judge Stranch, the amount of benefits coming out of the plan. It only affects the money going into the plan. There is no other place in ERISA where Congress subjects plans to a reasonableness requirement in the payment of benefits. Everywhere else, it's either... So what is your understanding of what actuarial equivalence means? Because if your argument is the reasonableness word is missing and we may put into our plan any actuarial assumptions we want, which the judge below said, 1600, it's your plan. And if they are written in, that's all that matters. How can that satisfy the express requirement of actuarial equivalence? In Stevens, the court said that actuarial equivalence is using a given set of assumptions. That's exactly what's happening here. And I would say further two things, Your Honor. First, 29 U.S.C. 1102B says that any basis for payments from the plan have to be specified in the plan. And 26 U.S.C. 401A25, the statute, says that whenever benefits are calculated pursuant to any actuarial assumptions, those assumptions need to be stated in the plan and done in a way that precludes discretion. Plaintiffs acknowledge that at page 3 of their reply brief. And yet you heard, mostly I would say in the Riker plaintiff's case, you heard her say that there has to be discretion here, there has to be some range. But Congress specifically didn't permit plans to put into their plan document that there would be discretion in the actuarial assumptions that were being used to calculate benefits. It said the opposite. And then how do you account for the base concept of ERISA that the trustees of a plan are fiduciaries? That in itself expresses a requirement of fiduciary duty, right? It does, Your Honor. And how does your idea that you can put anything you want in a plan, and as long as it's in the plan, that's notice, and they may calculate that way and, in fact, give what any actuary would say is not an equivalent benefit? Actuaries following the terms of the plan, using the statutory provisions in 401A25 and in 29 U.S.C. 1102, would calculate the benefits exactly the same way because the plan terms are what control. You mentioned ERISA fiduciary duties. Those duties include to follow the plan terms, and there is never a requirement to pay more in benefit. Don't those duties require the trustees to review the propriety of the plan? Not the plan terms, no, Your Honor. Whether the plan terms are reasonable or not is never something that ERISA plan fiduciaries have the ability to do. It's up to the plan sponsor to decide the benefits that it's going to provide to participants. The Supreme Court has made that clear time and again. You could have a plan to select the benefits, but it's also up to them to reasonably, as a fiduciary, provide what those benefits call for. That's true. So we are, I guess, quibbling over what actuarial equivalence means. How do you respond in that case to the quotations from the 1950s regarding what it means to honor your profession by employing contemporary actuarial assumptions? Actuaries are not only not required, but they're not permitted to be the ones with discretion to calculate actuarial equivalent benefits under the plan terms. 26 U.S.C. 401A25 says that it has to preclude any discretion, and Congress was very specific multiple times. Well, I'm not asking for the actuaries to change themselves the way they calculate. I understand that. The question is whether the plan is functioning appropriately as an ERISA-protected plan when it does not employ reasonable actuarial assumptions or, in other words, does it not actually comply with the requirement of actuarial equivalence. And what I would say to that, Your Honor, is 1055 uses the term reasonable five times. Never once in the context of the qualified joint and survivor annuity provisions, but always in other contexts, talking about notices that need to go out to people and time periods for things. Judge Nelbanian, you referenced the lump sum provisions in ERISA. Congress saw that there was a circumstance where plans were using unreasonable actuarial assumptions, and it didn't like it. It fixed that issue not by saying you need to use reasonable actuarial assumptions, but by mandating specific, precise assumptions, because Congress, the Supreme Court, have consistently made clear that you're supposed to be able to calculate benefits to the penny. So there's no limit at all. You can pick whatever assumption you want. As long as you write it down, make it clear, the actuaries who calculate it have to follow the plan. They have no discretion. If you say use this mortality table, they will use that mortality table. That's not me saying that. That's what Congress said in 401A25. But I would say further to your question, the actuarial assumptions here were the subject of collective bargaining. In fact, if I recall correctly, the complaint alleges that other parts of the union specifically negotiated changes to the actuarial assumptions for them. The representatives for these plaintiffs decided they didn't want to do that and thought that the current assumptions were appropriate for their plan participants. So we didn't have unilateral discretion to select whatever assumptions we want, but 1055 requires that you use the assumptions that are in the plan document and in a way that precludes employer discretion. Do you think that actuarial equivalence is some kind of term of art or trade usage or something like that, specialized term? I think it's not a term that you see every day, but I think it's a provision in a statute that's subject to a legal analysis of what that term means. And to get back to your earlier point, Judge Stranch, about the fact that this provision uses actuarial equivalent and some of the other provisions that we point to talk about actuarial assumptions, if you look at plaintiffs' reply brief here, they go from if you have to provide an actuarial equivalent benefit, that means you need to use actuarial assumptions. And if you need to use actuarial assumptions, then it would be redundant. That's the word they use at page 8 or 9 of their reply brief, to say that those assumptions need to be reasonable. But we know that that's precisely what Congress did not intend and did not understand because Congress says in lots of places, for this purpose, we want you to use reasonable assumptions and assumptions that reflect an actuary's judgment. I'm struggling with why you think because it was defined when an employer is withdrawing and about to leave a plan with terrible financial consequences from withdrawal that that is the equivalent of whether you are, in fact, complying with your fiduciary duty to pay an actuarially equivalent benefit to single-life, unmarried beneficiaries and married beneficiaries. That's the payment of the accrued benefit that those individuals have spent their working life earning, right? So why isn't that equivalency the same concept? It actually has to be equivalent. It has to be equivalent, Your Honor, but that bakes in under what assumptions. And what Stephen said is that's under a given set of assumptions. And it cites a treatise, I believe, from the 1950s for that purpose. And here, the given set of assumptions are the ones that Congress said have to be in the plan and have to be in the plan in a way that precludes any discretion. In other words, plaintiff's argument that what you're supposed to do is calculate benefits based on reasonable assumptions or current assumptions, you couldn't even write that into the plan if that's what you wanted to do. But why wouldn't it be? Why doesn't single life do that? It's this person's life. It would be this person's single life, which means today these interest rates, this mortality table. So I saw that in the Reichert plaintiff's brief in particular. And if you read what they say, it's the real-life participant. But even they don't mean that, Your Honor, because they don't say you're supposed to take the person's family history into the mix or the person's medical history into the mix to figure out how long they're likely to live when you calculate their benefit. That statutory provision is just a reference to what it is you're comparing, the joint and survivor annuity to the single life annuity. And the longer way of saying – You have to take all of that stuff into account. I could just say, okay, fine, it's imperfect. I'm not taking into account whether you have cancer or whatever. I'm just saying the least I can do is say today this mortality table and this interest rate. What I would say, Your Honor, is Congress could do that. And to your point, too, Judge Stranch, if Congress intended that same reasonableness requirement, that is, that it reflect the actuary's estimate of anticipated experience under the plan or that it be reasonable, it would have put that same language into 1055 that it included in 1082 and 1083 and 1084 and 1085 and 1393, and it didn't. And the one time where Congress was faced with a circumstance where they were addressing the use of unreasonable actuarial assumptions, it didn't impose a reasonableness requirement. It imposed specific mathematical calculations. That's true throughout ERISA. You talked about the fact that you can't contract around ERISA's requirements. But if you look at those requirements, every one of them, except for what plaintiffs are arguing here, imposes a specific mathematical requirement. You have to use the applicable interest rate and the applicable mortality table for lump sums. You're back to the same concept, that you have an absolute right to use any mortality tables you choose, period, right? We do not because they're subject to collective bargaining with the union that represents these individuals, and we would have to negotiate that with them. And we're also subject to other rules that are specific in ERISA that would apply here, too, like the anti-cutback rule. You couldn't use less favorable actuarial assumptions now than you used in the past. It would have been very easy if Congress intended to impose this reasonableness requirement or when it amended ERISA to say that for lump sums you need to use the applicable mortality table or applicable interest rate to say you have to do the same thing for qualified joint and survivor annuities or for all annuities and all benefits. But Congress didn't do that. And there's even a disclosure regulations, Your Honor. It's 26 CFR 417 that's about the relative value of the different benefit options, and that's what gives the participants the control. They get to see my benefit is worth X. This other benefit option available to me, a lump sum, would be worth less than X, you know, 85% of X, 90% of X. The qualified joint and survivor annuity would be worth Y and so on. And then they get to make the choice that's best for them. Except that ERISA requires for a married couple that qualified joint and survivor annuities be offered and that a default absolute right is to be named, right? That's true, Your Honor, and that's what Boggs was talking about. What would that mean if you can monkey with the assumptions that you use so that the spouse, for example, or the deceased employee does not get the benefit that is equal had he been unmarried? They are getting a benefit that is equal using the actuarial assumptions that are set forth in the plan. But I want to go back to Boggs. Joe, whatever you please. Yes or no, counsel, whatever you please or they're not. It is under ERISA. 1055 does not regulate the actuarial assumptions that are set forth in the plan. And your position is that that is not a part of fiduciary duty? Correct. You have to pay benefits pursuant to the terms of the plan, and if you had a provision, this is what Section 25 addresses. If you had a provision that said you're going to use reasonable assumptions or you're going to use current assumptions, that would be violative of Subsection 25 of the statute. You couldn't even do that if you wanted to. That's the choice that Congress made, and it would have been very easy for Congress to make a different choice, but it didn't do that in 1055. I do want to address Boggs, Your Honor, because I think the protection that the Boggs Supreme Court talked about was not about protecting married participants. It was about protecting spouses so that participants could not elect a benefit form that didn't leave anything for the spouse without the spouse weighing in on that and having the right to either waive that or not waive it. And that's the protection that I think you were talking about that I think plaintiffs are making a lot more about because it's not about protecting married participants. And also it's not about giving married participants a more valuable benefit than would be available to a non-married participant. And that's what the provision in 1055 does. It says if your single life annuity is $1,000 a month, for example, you don't get a joint survivor annuity that's $1,000 a month also. That would be a subsidy for married participants. And so the requirement that there be an actuarial equivalent to it is not to provide more benefits to married participants. It's to ensure that married participants and their spouses get a say in the benefit form they elect and to ensure that also everybody understands that doesn't mean married participants are more expensive to the plan, that they get a subsidy relative to unmarried participants. Your time is up. Thank you. Thank you very much, Your Honors. Thank you, Your Honors. I'll try to be brief. First, I'd like to defend my colleague, Ms. Pathak, by responding to the one argument that Mr. Blumenthal just made about discretion versus written. No one is arguing that you can write into the plan, use contemporary assumptions. Congress could write, use contemporary assumptions into the statute, and then the plan could be judged on whether it uses contemporary assumptions, and our view is that's essentially what they did when they said plans must provide for actuarially equivalent benefits. But we're not suggesting that the plan itself can just have a discretionary standard about what it's going to pay and calculate. That's completely wrong. I also think one thing that's been ignored so far in this argument is, and completely in my opponent's brief, is the case law on this issue. I recognize it is virtually all district court case law, although there is the Esden case from the Second Circuit, the McDaniel case from the Ninth Circuit, that are unrelated, although not completely identical issues. There are roughly 15 cases that have decided this issue. All but three, two of which are currently before you, have decided that the phrase actuarial equivalent in 1055D requires the use of reasonable or contemporary, or pick your word, assumptions, that the company is not free to just pick whatever actuarial assumptions it wishes to calculate the comparisons. How many of those cases was there evidence? I know in the Massachusetts case there was expert testimony about what the term means. How many of the other cases was there extrinsic evidence about meaning? Your Honor, I don't know the answer because all those decisions, with the exception of Belknap, the Massachusetts case you're referring to, were on motions to dismiss, I believe. So it was before any of it. There was only the evidence in the complaint or the allegations in the complaint. There was no testimony. In Belknap, the court first held that- You could attach evidence to your opposition and say, please treat this as a motion for summary judgment. It's not appropriate to resolve it at this stage. It's a technical term. It's trade usage. But if it's a question that is not appropriate to resolve at this stage, then the motion to dismiss should be denied. And we will then get to the point of- You can show the judge, hey, here's the expert report that we would be using.  My co-counsel is actually counsel in Belknap, and he would say that the district court misread the expert testimony in that case. But it was the district court's conclusion that the expert testimony in that case held that the behavior of the company in that case was reasonable. But in all these other cases, the district court decisions were written on motions to dismiss, so we never got to the question, and I haven't followed the subsequent proceedings in any of those cases. But the fact is, over 80% of the cases that have decided this issue have uniformly held, virtually uniformly held, that 1055D requires reasonable or contemporary assumptions, and they're very explicit about how it would undermine all the purposes of RISA to do otherwise. We string cite those cases in our opening brief of both 1819 and 3334, and they're in the reply brief. I think there's some additional discussion of them, but they're all of a piece. Shockingly, FedEx's brief mentions none of those cases, not a one. They don't attempt to distinguish them. They just ignore them. It's like, who can be bothered? They talk a lot about Reichert in this case and mention Drummond, the case where the Justice Department filed its amicus brief on our side, but they don't talk about the cases at all. Mike, opposing counsel just concluded by talking about BOGS and about how the purpose of BOGS is about protecting spouses and that the purpose of the statute is to ensure that married couples get the same amount as single employees and not that it shouldn't be more expensive to take care of married couples. We agree. We are not arguing that it should be more expensive to take care of married couples. We are saying that it shouldn't be less expensive to take care of married couples. Married couples are entitled to the same total value of an annuity that a single employee would be entitled to under the same circumstances, and the only way we can determine whether it's a similar value is by using present-day assumptions. There's no disagreement that the purpose of ERISA, in part, was to protect spouses. That's why they make the QJSA the default provision. That's why a spouse must consent to changing away from the QJSA. And as the Urlaub court, one of the district court opinions in this case, described, and I'll conclude with this point, the defendant's position leaves plaintiffs with a Hobson's choice. They can accept the QJSA, which is less valuable than the single-life annuity, and thereby ensure some income stream to a surviving spouse, or they can say, oh my God, the single-life annuity is worth much more under real-life actuarial assumptions, so we're going to take that one, and then if the employee happens to die well before his spouse, the spouse is left without any benefit at all. That scenario just cannot be what Congress intended when it mandated the QJSAs that are actuarially equivalent to the single-life annuity available under the plan. Thank you. We thank you both for your briefing and your arguments. In a very complex case, it will be taken under advisement and an opinion issued in due course.